UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | ) No. 20 CR 742 |
| | ) |
| DEMETRIUS COLEMAN, | ) Judge Sara L. Ellis |
| | ) |
| Defendant. | ) |

**OPINION AND ORDER**

When conducting a traffic stop on August 5, 2020, Chicago Police Department ("CPD") officers recovered a firearm in the car Defendant Demetrius Coleman was driving. On October 20, 2020, the government charged Coleman with possessing a firearm as a felon, in violation of 18 U.S.C. § 922(g)(1). Coleman now moves to suppress the firearm as the fruit of an unlawful search of his car. Because the firearm was in plain view once the CPD officers lawfully removed Coleman from the car, the Court denies Coleman's motion [15].

**BACKGROUND**[1]

On August 5, 2020, Coleman, a convicted felon, was driving his mother's black Jaguar SUV in CPD's Third District, near 6615 South Cottage Grove Avenue in Chicago, Illinois. Before he began driving that day, Coleman placed a firearm with an extended magazine underneath the driver's seat of the car. Coleman was carrying the firearm for protection because two of his close acquaintances, including a Chicago rapper and known gang member named "FBG Duck," had recently been killed and Coleman feared he may be next. That day, CPD

---

[1] The facts in the background section are taken from the parties' briefs and the exhibits attached thereto and the evidentiary hearing held on June 24, 2021.

Officers Joseph Biszewski, Zachary Gammonley, Keith Crot, and Lawrence Kerr[2] (the "Officers") were patrolling the Third District in two unmarked police cars, driving in tandem. The Officers are members of the Community Safety Team ("CST"), which is a group of CPD officers that patrol different areas of the City of Chicago (the "City") on an as needed basis; *i.e.*, on a daily basis, supervisors assign CST members to whichever area of the City calls for additional police presence at the time. On August 5, the Officers' supervisors tasked them with patrolling the Third District in anticipation of retaliatory gang violence in the area because of FBG Duck's murder the previous day.

At approximately 2:10 p.m., Officers Biszewski and Gammonley, while driving westbound on 68th Street, observed Coleman driving eastbound without a front license plate in violation of Illinois law. To pull Coleman over for the traffic violation, the Officers made a U-turn and Officer Gammonley activated his car's emergency lights. Coleman pulled over and Officer Gammonley parked his police car behind Coleman. Officer Crot testified that after Coleman pulled over, Coleman moved his car forward approximately six to twelve inches, which Crot interpreted as a sign that Coleman may flee the scene. Therefore, Officers Crot and Kerr parked their car at a forty-five-degree angle in front of Coleman's car, blocking his car from moving. After parking his car, Coleman testified that he called his parole officer and then his mother to inform them of the situation.

Officers Biszewski and Gammonley testified that before exiting their car, they saw Coleman, through the tinted trunk window of the Jaguar SUV, making movements downward towards the floor of the driver's seat. The Officers then exited their cars and approached Coleman's car; Officer Gammonley approached the driver's side window, Officer Biszewski

---

[2] Officers Biszewski, Gammonley, and Crot testified at the June 24, 2021 evidentiary hearing, but Officer Kerr did not.

2

approached the passenger side window, and Officers Crot and Kerr approached the front of the car. Coleman rolled down the driver's side window and Officer Gammonley asked for his license and registration. Coleman complied but loudly asserted that the Officers had pulled him over without cause. Officers Biszewski, Gammonley, and Crot testified that as Coleman was speaking to Officer Gammonley, he seemed agitated, his hands were shaking, and he was breathing rapidly. The Officers believed these to be signs of nervousness and that Coleman may be hiding something. Officer Gammonley testified that he spoke with Coleman for less than one minute and then took Coleman's license and registration back to his car to check them in CPD's computer system.

  Officers Crot and Kerr then asked Coleman to step out of the car. As the Officers approached, Coleman testified that he remained on the phone with his mother. Officers Biszewski and Crot testified that Coleman refused to leave the car and tried to roll up his window. However, Coleman testified that he did not try to roll up the window and only asked the officer why he had to step out of the car. Officer Crot testified that he or Officer Kerr prevented Coleman from rolling up the window by putting his arm through the window and opening the car door from inside the car. Officers Crot and Kerr then removed Coleman from the car, leaving the driver's door open, and moved him to the rear of the car on the driver's side. As Officers Crot and Kerr were removing Coleman from the car, Officer Biszewski came around to the driver's side of the car. While standing outside the car, looking through the open car door, Officer Biszewski testified that he saw the barrel of a firearm, about one-third of the firearm, sticking out from under the seat in which Coleman had been sitting. Officer Biszewski estimated that he saw the firearm less than two minutes after he left his car. Officer Gammonley testified that Officer Biszewski retrieved the firearm from the car less than one minute after he began

3

checking Coleman's license. Coleman testified, however, that the firearm was not sticking out from under the seat and that Officer Biszewski discovered it by searching underneath the seat, after he had searched both the glove box and center console.

Officer Biszewski retrieved one loaded Glock, model 17, 9mm pistol with an extended magazine, bearing the serial number AAEU669, from underneath the driver's seat of the Jaguar SUV.[3] The Officers then placed Coleman under arrest and read him his Miranda rights, which took place at approximately 2:14 p.m. according to Officer Biszewski's arrest report. The transport cars arrived at 2:18 p.m. to take Coleman to the police station. Therefore, the entire encounter lasted approximately eight minutes. The Officers did not have a warrant to search Coleman's car and testified that at the time, the CST had not received body worn cameras ("BWC") and therefore, they did not have BWC during this incident.

## ANALYSIS

**I.   Adverse Inference**

As a preliminary matter, Coleman argues that the Court should draw an adverse inference against the Officers because they intentionally did not utilize their BWCs as required by CPD policy during this traffic stop, which he contends is equivalent to intentional spoliation of evidence. *See* 50 Ill. Comp. Stat. 706/10-20(a)(3) (2016) (requiring law enforcement agencies that utilize BWCs to have written policies that require officers to turn on the cameras at all times they are "engag[ing] in any law enforcement-related encounter[s] or activit[ies]"); CPD Special Order S03-14: Body Worn Cameras, § III(A)(2)(c) (Apr. 30, 2018) (requiring CPD officers to turn on BWCs during traffic stops), http://directives.chicagopolice.org/directives/. In the Seventh Circuit, if a party intentionally destroys evidence in bad faith that it had a duty to preserve, the Court may draw an adverse inference against that party. *Lewis v. McLean*, 941

---

[3] Officer Biszewski also possesses a model 17 Glock pistol.

F.3d 886, 892 (7th Cir. 2019); *Bracey v. Grondin*, 712 F.3d 1012, 1018 (7th Cir. 2013). But Coleman has failed to establish that the Officers were wearing BWC at the time of this traffic stop or that any footage ever existed, and therefore Coleman has failed to demonstrate that the Officers destroyed evidence in bad faith. *Cf. United States v. Escalon*, 744 F. App'x 238, 239–40 (5th Cir. 2018) (finding that the defendant had failed to establish bad faith where the officer was wearing a BWC but no footage existed because it was unclear whether it was the officer's fault or an equipment failure); *Evans v. Lindley*, No. 19-3627, 2020 WL 6504449, at *2 (S.D. Tex. Nov. 5, 2020) (finding an officer did not commit spoliation where he tried to activate his BWC but it did not record). Therefore, the Court will not draw an adverse inference against the Officers.

## II. Seizure of the Firearm

Coleman concedes that the Officers lawfully stopped his car for a traffic violation but argues that the Officers unlawfully searched his car during the traffic stop in violation of the Fourth Amendment. The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (citation omitted). The government offers two justifications for the seizure of the firearm: (1) the Officers had reasonable suspicion to conduct a protective search of the car pursuant to *Michigan v. Long*, 463 U.S. 1032 (1983), and (2) the firearm was in plain view once the Officers removed Coleman from the car.

Because the Court finds the issue dispositive, it need only address whether the firearm was in plain view.[4] According to the plain view doctrine, a police officer may conduct a warrantless seizure if: [1] he "did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed; [2] the item was in plain view; and [3] its incriminating character was immediately apparent." *United States v. Shelton*, 997 F.3d 749, 767 (7th Cir. 2021). Therefore, officers may "view[ ] anything in plain sight 'from a public vantage point where they have a right to be'" and look through doors into places protected by the Fourth Amendment. *United States v. Contreras*, 820 F.3d 255, 261 (7th Cir. 2016) (citation omitted).

Officer Biszewski testified that once Officers Crot and Kerr removed Coleman from the driver's seat, he observed, through the open car door while standing outside the car, the barrel of a firearm sticking out from underneath the driver's seat. However, Coleman testified that the firearm was not sticking out from underneath the seat and that Officer Biszewski only found the firearm after searching the car for about two minutes. Coleman concedes that the traffic stop

---

[4] Officers Biszewski, Gammonley, and Crot explained that Coleman's behavior was abnormal because although drivers are usually nervous at the beginning of a traffic stop, they calm down quickly and are not agitated or combative. Officer Crot went so far as to say that drivers are usually "cool, calm, and collected" during traffic stops. Although the Court acknowledges that unusual nervousness may contribute to an officer's reasonable suspicion, *see, e.g.*, *United States v. Patton*, 705 F.3d 734, 739–40 (7th Cir. 2013) (noting that a driver's unusual nervousness indicated that he could be concealing a weapon), given the circumstances present here, the Court does not find Coleman's behavior particularly unusual or improbable, *see Huff v. Reichert*, 744 F.3d 999, 1007 n.3 (7th Cir. 2014) ("[N]ervousness is 'of limited value in assessing reasonable suspicion' and/or is so common that it alone cannot justify a *Terry* stop." (citation omitted)). This traffic stop took place in August 2020, when tensions between law enforcement officers and citizens, particularly those of color, were exceptionally high. At the end of May 2020, sparked by the killing of George Floyd, a black citizen, by a white police officer, the entire country, including the City, erupted in civil unrest. *See Alsaada v. City of Columbus*, No. 20-cv-3431, 2021 WL 1725554, at *5 (S.D. Ohio Apr. 30, 2021) ("Days after the killing [of George Floyd], protests began across the nation."). Coleman is a black citizen and all four Officers are white. Officer Crot acknowledged that in the summer of 2020, drivers of color were more agitated and nervous than normal during traffic stops. Given this tense backdrop and the way in which the Officers immediately surrounded Coleman's car, the Court does not find Coleman's response consequential. *Cf. United States v. Bullock*, No. 20-cr-2018, 2020 WL 5553562, at *13 (N.D. Iowa Aug. 21, 2020) (acknowledging that the "climate of protests following the death of George Floyd and other black men" could explain a black male's nervousness during his interaction with police officers).

was lawful and therefore, the Officers permissibly ordered him out of the car. *See United States v. Schlatter*, 411 F. App'x 896, 898–99 (7th Cir. 2011) ("The Supreme Court has held that officers can order a driver out of a vehicle for any lawful traffic stop."); *United States v. Cooks*, 168 F. App'x 93, 98 (7th Cir. 2006) ("Police may order a driver out of his car during a lawful traffic stop without any level of suspicion."). Therefore, at issue is whether the firearm was in plain view. The resolution of this issue depends on whose version of events the Court finds more credible. *See United States v. French*, 291 F.3d 945, 951 (7th Cir. 2002) (noting that the Court is free to make determinations of credibility based on each of a witness' "reactions and responses to the interrogatories, their facial expressions, attitudes, tone of voice, eye contact, posture and body movements, as well as confused or nervous speech patterns" (citation omitted)).

The Court finds Officers Biszewski, Gammonley, and Crot's testimonies regarding how Officer Biszewski retrieved the firearm more consistent with the timeline of events and logic and therefore, it credits their testimonies on this point over Coleman's. First, it is undisputed that only eight minutes elapsed from when the Officers pulled Coleman over and when the transport cars arrived. All three officers who testified said that Officer Biszewski retrieved the firearm within minutes of the Officers pulling Coleman over. Officer Biszewski's report, which he wrote shortly after the incident, supports this timeline, documenting that the Officers arrested Coleman four minutes after they pulled him over. This short amount of time supports that the firearm was in plain view, not Coleman's contention that the Officers searched the car before placing him under arrest. *See, e.g.*, *United States v. Cherry*, 920 F.3d 1126, 1138 (7th Cir. 2019) (upholding the denial of a motion to suppress where the district court credited the officer's testimony that drugs were in plain view in the car because the defendant's version of events did not make logical sense). Second, Coleman testified that he placed the firearm on the floor

7

underneath the driver's seat before he began driving that day. The firearm was larger than normal because it had an extended magazine on it. It is reasonable to believe that an unsecured object located on the floor of a car may shift while the car is moving. Accordingly, it is plausible that the firearm was sticking out from under the seat, particularly after Coleman unexpectedly stopped the car in response to the Officers pulling him over. *See, e.g.*, *United States v. Wilson*, No. 01 CR 847, 2002 WL 206980, at *5 (N.D. Ill. Feb. 11, 2002) (finding it possible for a firearm with a magazine to be sticking out from underneath the seat of a Lincoln Navigator).

Third, Coleman testified that he saw Officer Biszewski search the glove box, center console, and then under the driver's seat. However, when he allegedly observed this, Coleman was standing against the back of the car, surrounded by Officers Crot and Kerr. The rear windows of the car are tinted and therefore, to see Officer Biszewski's actions, Coleman would have had to look through tinted windows and through or around the front seats of the car. Accordingly, the Court discounts Coleman's testimony regarding Officer Biszewski's search.[5] *See, e.g.*, *id.* at *6 (finding the officer's version of events more credible than the defendant's regarding whether the firearm was in plain view in the car where the defendant's testimony regarding the officer's search of the car was not plausible).

---

[5] Similarly, the Court discredits Officers Biszewski and Gammonley's testimonies regarding Coleman's alleged furtive movements. In the same way that the car's seats and tinted windows would have obstructed Coleman's view of Officer Biszewski searching the car, they also would have obstructed Officers Biszewski and Gammonley's views of Coleman's alleged furtive movements. When Officers Biszewski and Gammonley allegedly made these observations, they were sitting in their car, at least fifteen feet away from Coleman, with multiple objects obstructing their view. *See, e.g.*, *United States v. Linear*, No. 08 CR 207, 2008 WL 4545338, at *3–4 (N.D. Ill. Oct. 8, 2008) (discrediting the officer's testimony that he observed the driver make furtive movements while he was exiting his car where the officer could not have observed the driver from that position). Further, despite testifying to seeing Coleman's hands trembling, Officers Biszewski and Gammonley did not testify to seeing a cell phone in Coleman's hands, while Officer Crot did; and despite testifying to seeing that the car was missing a front license plate, Officer Gammonley testified that he did not see the race or gender of the car's driver when he drove past the car. Accordingly, the Court does not find Officers Biszewski and Gammonley's testimonies regarding Coleman's furtive movements credible.

Last, Coleman does not claim that he concealed the firearm in a container or in a different location than where the Officers claim to have found it. He admits he placed the firearm exactly where Officer Biszewski found it but argues that the firearm was not discoverable without reaching underneath the seat. However, once the Officers lawfully removed Coleman from the car, even if the barrel was not sticking out, they presumably could have bent over to look underneath the driver's seat from outside the car, without moving or touching anything, to see the firearm, which undisputedly was unsecured and unconcealed underneath the driver's seat. *See, e.g.*, *United States v. Willis*, 37 F.3d 313, 316 (7th Cir. 1994) (finding that the officer's seizure of firearm from under the driver's seat was authorized by the plain view doctrine where the driver's door was open and the officer's "use of a flashlight and his subsequent crouching on the ground in order to get a better look" confirmed that what he saw under the seat was a firearm); *United States v. Luckey*, No. 20 CR 313, 2021 WL 271295, at *4 (N.D. Ill. Jan. 27, 2021) (finding no Fourth Amendment violation where "[t]he door to the vehicle was open and the Troopers could see the gun in plain view" because "there is no legitimate expectation of privacy . . . shielding that portion of the interior of an automobile which may be viewed from outside the vehicle by either inquisitive passerby or diligent police officers" (quoting *United States v. Williams*, 459 F.3d 810, 815 (7th Cir. 2007)) (alteration in original)).

Therefore, the Court finds that a search of Coleman's car did not occur and instead, the firearm was in plain view. Because the incriminating character of the item was immediately apparent to Officer Biszewski, particularly because he possesses the same type of firearm, it was permissible for him to seize it without a warrant. *See* 720 Ill. Comp. Stat. 5/24-1(a)(4)(ii) (forbidding persons from possessing a firearm in an immediately accessible location in a car); *United States v. Davis*, 418 F. App'x 556, 558 (7th Cir. 2011) (affirming denial of motion to

suppress firearm where the firearm was in plain view once the occupants exited the car). Therefore, the Officers did not violate Coleman's Fourth Amendment rights by seizing the firearm.

## CONCLUSION

For the foregoing reasons, the Court denies Coleman's motion to suppress [15].

Dated: September 1, 2021

SARA L. ELLIS
United States District Judge